# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TIMOTHY D. FINLEY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) **Case No. _____** |
| Plaintiff, | ) **COMPLAINT – CLASS ACTION FOR** |
|  | ) **VIOLATIONS OF SECTIONS 14(a)** |
| v. | ) **AND 20(a) OF THE SECURITIES** |
|  | ) **EXCHANGE ACT OF 1934** |
| DOVER DOWNS GAMING & ENTERTAINMENT, INC., PATRICK J. BAGLEY, TIMOTHY R. HORNE, DENIS MCGLYNN, JEFFREY W. ROLLINS, R. RANDALL ROLLINS, and HENRY B. TIPPIE, | ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) |

Plaintiff Timothy D. Finley ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and all other similarly situated public stockholders of Dover Downs Gaming & Entertainment, Inc. ("Dover Downs" or the "Company") against Dover Downs and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Dover Downs, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), respectively, and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Dover Downs by Twin River Worldwide Holdings, Inc. ("Twin River").

2.      On July 22, 2018, and later amended on October 8, 2018, Dover Downs, Twin River, Double Acquisition Corp., a Delaware corporation and indirect wholly owned subsidiary of Twin River ("Merger Sub I"), and DD Acquisition LLC, a Delaware limited liability company and indirect wholly owned subsidiary of Twin River ("Merger Sub II"), entered into a transaction agreement (the "Merger Agreement"), pursuant to which Merger Sub I will merge with and into Dover Downs, with Dover Downs surviving the merger as an indirect wholly owned subsidiary of Twin River (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, each share of Dover Downs common stock and class A common stock (together, the "Dover Downs Stock") will be cancelled and converted into the right to receive a number of validly issued, fully paid and non-assessable shares of common stock of Twin River equal to the quotient obtained by dividing (1) the aggregate number of shares of Twin River common stock issued and outstanding immediately prior to the effective time of the Merger, on a fully diluted, as-converted basis, multiplied by 0.07787658, by (2) the aggregate number of shares of Dover Downs Stock issued and outstanding immediately prior to the effective time of the Merger, on a fully diluted, as-converted basis, plus cash in lieu of any fractional shares (the "Merger Consideration").

4.      On November 5, 2018, in order to convince Dover Downs' stockholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading preliminary proxy statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Dover Downs and Twin River; (ii) the valuation analyses performed by Dover Downs' financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"),

in support of their fairness opinion; (iii) the background process leading to the Proposed Transaction; and (iv) the potential conflicts of interest Houlihan Lokey faced as a result of its historical dealings with affiliates of Twin River.

6.    The special meeting of Dover Downs stockholders to vote on the Proposed Transaction is forthcoming.  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the stockholder vote on the Proposed Transaction so that they can properly exercise their corporate suffrage rights.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the upcoming stockholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Dover Downs' stockholders sufficiently in advance of the stockholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

8.    Plaintiff is, and has been at all relevant times, a stockholder of Dover Downs common stock.

9.    Defendant Dover Downs is a Delaware corporation, with its principal executive offices are located at 1131 North DuPont Highway, Dover, Delaware 19901.  Dover Downs is a public holding company that has two wholly owned subsidiaries: Dover Downs, Inc. and Dover Downs Gaming Management Corp.  Dover Downs common stock trades on the NYSE under the ticker symbol "DDE."

10.    Defendant Patrick J. Bagley is, and has been at all relevant times, a director of Dover Downs.

11.    Defendant Timothy R. Horne is, and has been at all relevant times, a director of Dover Downs.

12.    Defendant Denis McGlynn is, and has been at all relevant times, a director of Dover Downs.

13.    Defendant Jeffrey W. Rollins is, and has been at all relevant times, a director of Dover Downs.

14.    Defendant R. Randall Rollins is, and has been at all relevant times, a director of Dover Downs.

15.    Defendant Henry B. Tippie is, and has been at all relevant times, a director of Dover Downs.

16.    The parties in paragraphs 10 through 15 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Dover Downs the "Defendants."

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

18.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as

Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

19.    Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Dover Downs' common stock trades on the New York Stock Exchange, which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public common stockholders of Dover Downs (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

21.    This action is properly maintainable as a class action because:

a)    the Class is so numerous that joinder of all members is impracticable.  As of October 31, 2018, there were approximately 18.41 million common shares of Dover Downs outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Dover Downs will be ascertained through discovery;

b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

    ii.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g)   a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Background of the Company and the Proposed Transaction

22.   Dover Downs is a public holding company that has two wholly owned subsidiaries: Dover Downs, Inc. and Dover Downs Gaming Management Corp.   Dover Downs, Inc. was incorporated in 1967 and began motorsports and harness racing operations in 1969.   In June of 1994, legislation authorizing video lottery operations in the State of Delaware was adopted.   Dover Downs' casino operations began on December 29, 1995.   As a result of several restructurings, Dover Downs, Inc. became a wholly owned subsidiary of Dover Motorsports, Inc. (formerly known as Dover Downs Entertainment, Inc.) ("DVD"), and became the operating entity for all of DVD's gaming operations.   The Company was incorporated in Delaware in December 2001 as a wholly owned subsidiary of DVD.   Effective March 31, 2002, DVD completed a tax-free spin-off of its gaming operations by contributing 100% of the issued and outstanding common stock of Dover Downs, Inc. to the Company, and subsequently distributing 100% of Dover Downs' issued and outstanding common stock to DVD stockholders.   Immediately following the spin-off, Dover Downs became an independent publicly traded company.

23.   Dover Downs owns the Dover Downs Hotel & Casino® which is a premier gaming and entertainment resort destination in the Mid-Atlantic region.   Gaming operations consist of approximately 2,200 slots, a full complement of table games, including poker, and a newly

expanded race and sports book taking single game wagers on professional and college sports. The AAA-rated Four Diamond hotel is Delaware's largest with 500 luxurious rooms/suites and amenities including a full-service spa/salon, concert hall and 41,500 sq. ft. of multi-use event space. Live, premier harness racing is featured November through April, and horse racing is simulcast year-round. Additional property amenities include multiple restaurants from fine dining to casual fare, bars/lounges and retail shops.

24. Twin River is a multi-jurisdictional owner of gaming and racing facilities. Twin River owns and manages two casinos in Rhode Island, one in Biloxi, Mississippi as well as a Colorado horse racetrack with OTB licenses. Twin River's flagship casino, the Twin River Casino, is located in Lincoln, Rhode Island and offers 162,000 square feet of gaming space on two floors with 4,220 VLTs and 119 table games, including a poker room.

25. On July 22, 2018, Dover Downs and Twin River issued a joint press release announcing the Proposed Transaction. The press released, stated in relevant part:

### Dover Downs Gaming & Entertainment, Inc. To Combine With Twin River Worldwide Holdings, Inc.

July 22, 2018:  Dover Downs Gaming & Entertainment, Inc. (NYSE: DDE) and Twin River Worldwide Holdings, Inc. announced today that they have entered into a definitive merger agreement. The proposed transaction will transform Twin River into a publicly traded company with strategically placed gaming and entertainment holdings throughout the United States.

The merger contemplates that Dover Downs stockholders will exchange their Dover Downs stock for Twin River common shares representing 7.225% of the equity in the combined company at closing.  Common Stock and Class A Common Stock of Dover Downs will be treated equally in the merger.  The transaction is intended to qualify as a tax-free reorganization (except for cash paid in lieu of fractional shares).

Twin River is privately held and there is currently no public market for its shares.  As a condition to closing, Twin River will register its

shares with the Securities and Exchange Commission (the "SEC") and list the shares on the NYSE or NASDAQ.  For the fiscal year ended December 31, 2017, Twin River's results were:

| | | |
|---|---|---|
| Net revenue | $ | 428.8 million |
| Income before provision for income taxes | $ | 102.2 million |
| Net income | $ | 63.5 million |
| Adjusted EBITDA | $ | 167.2 million |
| EBITDA | $ | 160.7 million |
| Basic EPS | $ | 6.63/share |
| Diluted EPS | $ | 6.59/share |

Adjusted EBITDA and EBITDA are non-GAAP financial measures. See "Non-GAAP Financial Measures." As of March 31, 2018, Twin River's GAAP debt was $381.4 million, unrestricted cash and cash equivalents were $64.8 million and primary shares outstanding were 9.582 million.

The number of Twin River shares to be issued will be calculated based on each company's fully diluted share count at closing. Based on each company's share count as of the date hereof, each share of Dover Downs stock would be exchanged for 0.0225 shares of Twin River stock.  Twin River contemplates effecting a stock split prior to closing intended to bring its stock price to a marketable trading range, which would result in a corresponding adjustment to the exchange ratio.  Twin River also currently intends to initiate a tender offer or other form of return of capital transaction after the closing. The amount and terms will be determined at that time and be based upon prevailing market conditions, Twin River's financial condition and prospects and other factors.

Dover Downs' President and CEO, Denis McGlynn stated, "Becoming part of Twin River is transformational for us.  We have been impressed with the depth and talent of the Twin River organization and their operational capabilities. We believe this transaction will help us grow our business, invest in our people and our facilities and compete more effectively given changes in gaming on the horizon.  We expect to see many positive benefits for the State, the Delaware Lottery and our employees and stockholders."

Jeffrey W. Rollins, a director and member of the Audit Committee of Dover Downs is expected to join the Twin River Board of Directors post-closing, pending regulatory approval.

A committee of the Board of Directors of Dover Downs comprised of non-executive, independent directors unanimously determined

that the transaction is fair to, and in the best interests of, Dover Downs and its stockholders. The Dover Downs Board of Directors has also unanimously approved the transaction, and has recommended that Dover Downs' stockholders approve the merger. Houlihan Lokey Capital, Inc. provided a fairness opinion to the Dover Downs Board of Directors in connection with the transaction. All directors and executive officers of Dover Downs executed a Voting Agreement by which they agree to vote in favor of the merger, subject to the terms and conditions set forth in the agreement. The approval of a majority of Dover Downs' unaffiliated stockholders is a condition to closing.

Twin River Executive Chairman John E. Taylor, Jr. said, "We're excited about the many benefits we believe we will realize from the combination. Dover Downs and its team are experienced in not only brick and mortar casino operations, but in sports betting, which we think will be helpful as we introduce that amenity at our properties, and in the online gaming sector which continues to evolve nationwide. Equally important, we see real opportunities to grow the Dover Downs business through investment in its people and facilities, similar to what we have achieved with our other assets over the past several years."

Taylor continued, "We've been focused on growing the overall business for some time now as a means to create greater shareholder value, expand our geographic footprint to achieve financial economies and strengthen our financial position. This merger should well position us to achieve all three objectives in a context in which existing shareholders of Twin River who desire it could obtain liquidity."

He concluded, "We're grateful for the strong partnership we enjoy with the State of Rhode Island at our flagship property, and we look forward to working equally effectively with the State of Delaware in maximizing the potential of Dover Downs."

The merger would provide a physical presence for Twin River in the Mid-Atlantic region, a new geographic market. Twin River already operates assets in the South (Biloxi, Mississippi), West (Aurora, Colorado) and Northeast (Lincoln and Tiverton, Rhode Island (opening shortly)) regions.

The consummation of the merger is also subject to regulatory approvals and other customary closing conditions.

Dover Downs was advised by Citizens Capital Markets as financial advisor and Drinker Biddle & Reath LLP as legal counsel. Twin River's financial advisors were Moelis & Company LLC and Stifel and its counsel was Jones Day.[1]

26.      The Merger Consideration the Company's stockholders stands to receive if the Proposed Transaction is consummated is unfair and excessive because, among other things, the intrinsic value of the Dover Downs is materially in excess of the amount offered given the Company's prospects for future growth and earnings.

27.      Indeed, prior to the announcement of the Proposed Transaction, Dover Downs stock has increased more than **95%** during 2018:



Dover Down's considerable growth can largely be attributed to the Delaware legislature enacting a new law that will lower the tax burden on casinos, which suggests ~$7 million in annual savings for Dover Downs (and ~400 bps in operating margin improvement).  Additionally, in May 2018, the Supreme Court struck down the federal prohibition on sports betting, and Delaware quickly

---

[1]    Dover Downs Gaming & Entertainment, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Joint press release, dated July 22, 2018) (June 23, 2018).

expanded legalization which allowed Dover Downs to move from offering parlay-only betting to single-game options on a wider variety of sports.

28.    Clearly, Dover Downs is poised for considerably growth in the future.  As a result, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for stockholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.    The Materially Incomplete and Misleading Proxy**

29.    On November 5, 2018, Dover Downs filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's stockholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

30.    First, the Proxy fails to provide sufficient information regarding financial projections for the Company and Twin River.

31.    Specifically, the Proxy omits cash flow projections for Dover Downs and Twin River (the "Cash Flow Projections").  As stated in the Proxy, Houlihan Lokey performed a discounted **cash flow** ("DCF") analysis of Dover Downs and Twin River using the projections provided on page 65 of the Proxy.  However, the *Certain Unaudited Projections* section of the Proxy fails to disclose **any** cash flow projections for Dover Downs and Twin River.

32.     It is indisputable that the Cash Flow Projections are the most important input in Houlihan Lokey's *Discounted Cash Flow Analysis*—the entire analysis is based upon discounting the Cash Flow Projections to present value.  However, Defendants elected to exclude the Cash Flow Projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of Houlihan Lokey's *Discounted Cash Flow Analysis* and both companies' projections.

33.     Defendants elected to summarize the projections for both companies on pages 65 of the Proxy, but they excised and failed to disclose the most important projection—the Cash Flow Projections.  The omission of the Cash Flow Projections renders the projection tables on page 65 of the Proxy incomplete and misleading because, without the Cash Flow Projections, the projection summaries provide a misleading overall valuation picture of both companies.  This is because there are significant differences between cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the projections that were included in the Proxy: Revenue and EBITDA.

34.     The disclosed primary projection metrics (Revenue and EBITDA) **are not sufficient analogs for cash flow projections**.  Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, **not projected revenue or EBITDA**.

35.     First, there are fundamental differences between free cash flows and revenue.  Revenue is simply a top line accounting of what a company earns from the sale of goods or services related to the company's primary operations.  It never accounts for any expenses or costs.  Unlevered free cash flows, meanwhile, track the actual cash in hand and the cash that flows in and out of the company—cash that enables a company to settle debts, reinvest in its business, return

money to stockholders, pay expenses, and provide a buffer against future financial challenges. "The critical importance of cash flow lies in the ability of a company to remain functional; it must always have sufficient cash to meet short-term financial obligations."[2]  Revenue should also be understood as a one-way inflow of money into a company, while cash flow represents inflows and outflows of cash.  Cash flow also differs from revenue in that is not accrued.

36.    Likewise, there are fundamental differences between unlevered free cash flows and EBITDA.  EBITDA is not a sufficient alternative to unlevered free cash flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[3]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[4] As a result of these material differences between EBITDA and unlevered free cash flows, experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

37.    In light of these significant differences between free cash flows on the one hand, and the projected metrics that Defendants elected to disclose in the Proxy—Revenue and

---

[2]    J.B. Maverick, *How are cash flow and revenue different?*, INVESTOPEDIA (July 19, 2018), https://www.investopedia.com/ask/answers/011315/what-difference-between-cash-flow-and-revenue.asp.

[3]    Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[4]    Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

EBITDA—the tables of projections on pages 65 of the Proxy were materially incomplete and misleading because, by failing to include the Cash Flow Projections, the tables provide a materially incomplete and misleading overall valuation picture of both companies.  Simply put, free cash flow projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

38.    The omission of the Cash Flow Projections renders the financial projections included in the Proxy misleading.  If a Proxy discloses financial projections and valuation information, such projections must be **complete and accurate**.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—**but it may not choose half-truths**.  Accordingly, Defendants have disclosed some of the projections relied upon by Houlihan Lokey, but have omitted the Cash Flow Projections.  Thus, their omission renders the projections disclosed on page 65 misleading.

39.    Second, the Proxy describes each of the Houlihan Lokey's fairness opinion and the various valuation analyses performed in support of their opinion.  However, the description of Houlihan Lokey's fairness opinion and analyses fails to include key inputs and assumptions underlying the analyses.  Without this information, as described below, Dover Downs' stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Houlihan Lokey's fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Dover Downs' common stockholders.

40.    With respect to Houlihan Lokey's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) Dover Downs' **projected cash**

**flows** that were discounted to find the present value of the Company's cash flows; (ii) the inputs and assumptions underlying the selection of the terminal value multiples of 6.5x to 7.5x applied to Dover Downs; (iii) the inputs and assumptions underlying the calculation of the discount rate range of 10.0% to 11.0% applied to Dover Downs; (iv) Twin River's **projected cash flows** that were discounted to find the present value of the Twin River's cash flows; (v) the inputs and assumptions underlying the selection of the terminal value multiples of 8.0x to 9.0x applied to Twin River; (vi) the inputs and assumptions underlying the calculation of the discount rate range of 7.5% to 8.5% applied to Twin River; and (vii) the final results of Dover Downs' and Twin River's separate DCF analysis. *See* Proxy at 62.

41.    These key inputs are material to Dover Downs' stockholders, and their omission renders the summary of Houlihan Lokey's *Discounted Cash Flow Analysis* analyses incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a DCF analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…* This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the

> process vulnerable to manipulation to arrive at the "right" answer
> for fairness. This raises a further dilemma in light of the conflicted
> nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Dover Downs stockholders cannot evaluate for themselves the reliability of Houlihan Lokey's *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied Dover Downs equity contribution reference ranges reflect the true value of the Company or was the result of Houlihan Lokey's unreasonable judgment, and make an informed decision regarding whether to vote their shares in the Proposed Transaction.

42.    With respect to Houlihan Lokey's *Selected Companies Analysis*, the Proxy fails to disclose the reasoning behind Houlihan Lokey's selection of certain multiples it applied to Dover Downs and Twin River, including: (i) 6.5x to 7.5x to Dover Downs' LTM Adjusted EBITDA ended March 31, 2018; (ii) 6.0x to 7.0x to Dover Downs' estimated CY 2018E Adjusted EBITDA; (iii) 6.0x to 7.0x to Dover Downs' estimated CY 2019E Adjusted EBITDA; (iv) 5.5x to 6.5x to Dover Downs' estimated CY 2020E Adjusted EBITDA; (v) 8.0x to 9.0x to Twin River's LTM Adjusted EBITDA ended March 31, 2018; (vi) 7.5x to 8.5x to Twin River's estimated CY 2018E Adjusted EBITDA; (vii) 7.0x to 8.0x to Twin River's estimated CY 2019E Adjusted EBITDA; and (viii) 7.0x to 8.0x to Twin River's estimated CY 2020E Adjusted EBITDA. *See* Proxy at 62.

43.    Indeed, as illustrated below, Houlihan Lokey inexplicably applied multiples that are considerably below the median and mean values of the selected **comparable** companies for each of the different metrics considered:

| Selected Company | LTM | CY 2018E | CY 2019E | CY2020E |
| --- | --- | --- | --- | --- |
| Boyd Gaming Corporation | 12.4 | 11.5 | 8.5 | 8.0 |
| Churchill Downs Incorporated | 15.8 | 14.6 | 12.9 | N/A |
| Eldorado Resorts, Inc. | 13.2 | 12.2 | 11.3 | 11.0 |
| Full House Resorts, Inc. | 11.3 | 8.8 | 7.8 | 6.7 |
| Golden Entertainment, Inc. | 12.0 | 9.8 | 9.0 | 8.5 |

| | | | | |
|---|---|---|---|---|
| Monarch Casino & Resort, Inc. | 16.1 | 14.1 | 11.4 | 9.0 |
| Nevada Gold & Casinos, Inc. | 5.5 | N/A | N/A | N/A |
| Penn National Gaming, Inc. | 10.3 | 8.5 | 8.4 | 8.5 |
| **Calculated Mean** | **12.1** | **11.4** | **9.9** | **8.6** |
| **Calculated Median** | **12.2** | **11.5** | **9.0** | **8.5** |

The failure to provide Dover Downs stockholders with Houlihan Lokey's rationale behind selecting the multiple ranges that were utilized in the analysis renders the summary of the analysis and the implied Dover Downs equity contribution reference ranges for each metric materially misleading.   Indeed, a fair summary of the analysis requires Houlihan Lokey's reasoning for selecting the multiple ranges that were utilized in the analysis, despite being significantly below the calculated mean and median values for each metric that was considered.   Accordingly, Houlihan Lokey's *Selected Companies Analysis* is materially incomplete and misleading, and the reasoning for selecting the different multiple ranges for each metric must be disclosed so Dover Downs stockholders can determine whether the implied Dover Downs equity contribution reference ranges set forth in the Proxy actually reflect the true value of their interest in the Company.

44.      Finally, the Proxy also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction.

45.      Specifically, the Proxy states that "[o]n September 21, 2017, Dover Downs and Party A entered into a mutual non-disclosure agreement…"  Proxy at 51.  However, the Proxy fails to disclose whether the non-disclosure agreement contained a standstill provision and, if so, how long the provision remained in effect, whether the agreement contained a "don't ask don't waive" ("DADW") provision, and whether such a provision fell away upon the execution of the Merger Agreement or still remained in effect.  Such information is material to Dover Downs stockholders,

as it bears directly on the ability of Party A to offer a better deal. The failure to disclose the existence of DADW provisions creates the false impression that Party A could have made a superior proposal. **But that is not true.** If the non-disclosure agreement contained DADW provisions, Party A could only make a superior proposal by breaching its agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the references to the non-disclosure agreement in the Proxy materially incomplete and therefore misleading as any reasonable stockholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

46. The Proxy also fails to disclose or misstate material information that materially misleads stockholders as to the potential conflicts of interest faced by Houlihan Lokey.

47. In particular, the Proxy states:

> Houlihan Lokey and certain of its affiliates have in the past provided and are currently providing investment banking, financial advisory and/or other financial or consulting services to Standard General, L.P. ("SG"), Twin River's largest stockholder, or one or more security holders or affiliates of, and/or portfolio companies of investment funds affiliated or associated with, SG (collectively, with SG, the "SG Group"), for which Houlihan Lokey and its affiliates have received, and may receive, compensation, **including, among other things,** during the last two years having acted as financial advisor to ALST Casino Holdco LLC, then a member of the SG Group, in connection with its sale transaction, which closed in September 2016 for which Houlihan Lokey received compensation of approximately $6.8 million. Houlihan Lokey and certain of its affiliates may provide investment banking, financial advisory and/or other financial or consulting services to Dover Downs, Twin River, members of the SG Group, other participants in the Merger or certain of their respective affiliates or security holders in the future, for which Houlihan Lokey and its affiliates may receive compensation.

Proxy at 63.  As a result, the Proxy fails to disclose potential "other things" that Houlihan Lokey may be receiving, or expect to receiving, compensation for in connection with services its has provided to Standard General, L.P.

48.     Such information is material to Dover Downs stockholders, particularly in light of the fact that Standard General, L.P is Twin River's largest and, consequently most influential, stockholder.  Indeed, it is imperative for stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.  A financial advisor's own financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis.  A reasonable stockholder would want to know about any economic motivations the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have. Especially when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to him than approving a deal at a truly fair price to stockholders.  The omission of Houlihan Lokey's complete previous and current dealings or relationships, and any compensation received or expected to be received, renders the Proxy incomplete and misleading.

49.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

50.    Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

51.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

52.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

53.    The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

54.    Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Dover Downs and Twin River; (ii) the valuation analyses performed by Houlihan Lokey in support of their fairness opinion; (iii) the

background process leading to the Proposed Transaction; and (iv) the potential conflicts of interest Houlihan Lokey faced as a result of its historical dealings with affiliates of Twin River.

55.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to common stockholders although they could have done so without extraordinary effort.

56.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Houlihan Lokey reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Houlihan Lokey, as well as their fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above had been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Houlihan Lokey's analyses in connection with their receipt of their fairness opinion, question Houlihan

Lokey as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.   The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.   The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.   Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

58.     Dover Downs is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

59.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the stockholder vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

60.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

61.    The Individual Defendants acted as controlling persons of Dover Downs within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Dover Downs, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

64.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED: December 21, 2018                Respectfully submitted,

                                        */s/ Juan E. Monteverde*
                                            Juan E. Monteverde

                                        **MONTEVERDE & ASSOCIATES PC**
                                        The Empire State Building
                                        350 Fifth Avenue, Suite 4405
                                        New York, NY 10118
                                        Tel.: (212) 971-1341
                                        Fax: (212) 202-7880
                                        Email: jmonteverde@monteverdelaw.com

                                        *Counsel for Plaintiff*